Oral Argument Scheduled for May 8, 2026

No. 24-5195

---

# In the United States Court of Appeals for the District of Columbia Circuit

---

JOHN DOE,

*Plaintiff-Appellant,*

*v.*

PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,

*Defendant-Appellee,*

and

UNITED STATES OF AMERICA,

*Intervenor.*

---

On Appeal from the United States District Court
for the District of Columbia, No. 1:24-cv-00780-UNA

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Ian D. Roffman
Melanie V. Woodward
NUTTER MCCLENNEN & FISH LLP
Seaport West
155 Seaport Blvd.
Boston, MA  02210
(617) 439-2421
iroffman@nutter.com

Russell G. Ryan
(*Counsel of Record*)
Casey Norman
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

***Parties and* Amici**.   Plaintiff-Appellant John Doe, a natural person litigating under a pseudonym, is an accountant who resides outside of the United States.   Defendant-Appellee Public Company Accounting Oversight Board is a quasi-governmental private, nonprofit corporation created by the Sarbanes-Oxley Act of 2002 having its headquarters in Washington, D.C.  The United States was an intervenor in the district court.   No *amici* have appeared thus far in either the district court or in this Court.

***Ruling Under Review***.  Appellant Doe seeks review of the district court's August 2, 2024 Memorandum Opinion and Order (JA 062), which among other things denied his motion for leave to litigate his case pseudonymously (ECF No. 66).[1]

***Related Cases***.  There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).  However, this case is consolidated in the district

---

[1] The district court subsequently granted Appellant Doe's consent motion to stay the effect of its Memorandum Opinion and Order pending this Court's decision on appeal.  *See* ECF Nos. 78 and Minute Order entered on September 26, 2024.

i

court with another case, *John Doe v. PCAOB*, No. 1:25-cv-186-ACR, in which an unrelated John Doe plaintiff has raised certain issues similar to those in the case on appeal.

March 23, 2026                          /s/ *Russell G. Ryan*
                                        Russell G. Ryan

                                        *Counsel for Plaintiff-Appellant*
                                        *John Doe*

ii

# CORPORATE DISCLOSURE STATEMENT

None of the parties to this case in either the district court or in this Court has a parent corporation and none is a publicly traded corporation or an affiliate of any such corporation.

March 23, 2026                          /s/ *Russell G. Ryan*

Russell G. Ryan

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) ..................................................i

CORPORATE DISCLOSURE STATEMENT ......................................... iii

TABLE OF AUTHORITIES ..............................................................v

GLOSSARY ................................................................................ix

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUE PRESENTED FOR REVIEW ........................1

PERTINENT STATUTES AND REGULATIONS ...................................1

STATEMENT OF THE CASE ...........................................................2

SUMMARY OF ARGUMENT .............................................................4

ARGUMENT .................................................................................7

    I. STANDARD OF REVIEW ........................................................7

    II.  APPLICABLE LEGAL PRINCIPLES .........................................7

    III. PSEUDONYMITY AND OPEN JUDICIAL PROCEEDINGS ......................10

    IV. PSEUDONYMITY IS WARRANTED HERE...........................................14

        A.    The Statutory Confidentiality Mandates of Sarbanes-Oxley Favor Pseudonymity .........................................................16

        B.    The *Sealed Case I* Factors Favor Pseudonymity.................27

        C.    Appellant Doe's Likelihood of Success on the Merits Favors Pseudonymity..................................................................43

CONCLUSION ...........................................................................45

CERTIFICATE OF COMPLIANCE......................................................46

CERTIFICATE OF SERVICE............................................................47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Americans for Prosperity v. Bonta,*
  594 U.S. 595 (2021) ................................................................41

*Axon Enter., Inc. v. FTC and SEC v. Cochran,*
  598 U.S. 175 (2023) ..................................................................1

*Bill Johnson's Restaurants, Inc. v. NLRB,*
  461 U.S. 731 (1983) ................................................................39

*Buckley v. Am. Const. Law Found., Inc.,*
  525 U.S. 182 (1999) ................................................................41

*California Motor Transp. Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ................................................................39

*Citizens for Resp. & Ethics in Wash. v. DOJ,*
  854 F.3d 675 (D.C. Cir. 2017)................................................29

*Doe v. Hill,*
  141 F.4th 291 (D.C. Cir. 2025) ................................ 1, 7, 10, 30, 35, 36

*Doe v. SEC,*
  114 F.4th 687 (D.C. Cir. 2024) ........................................24, 25

*Doe v. Stegall,*
  653 F.2d 180 (5th Cir. 1981) ............................................13, 14

*Doe v. U.S. Citizenship & Immigr. Servs.,*
  No 25-3481, 2025 WL 2851639 (D.D.C. Oct. 8, 2025) ........................35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ..................................................................1

*Globe Newspaper Co. v. Superior Ct. for Norfolk,*
  457 U.S. 596 (1982) ................................................................10

*In re Motions of Dow Jones & Co.,*
  142 F.3d 496 (D.C. Cir. 1998)................................................22

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997)..................................................................22

*In re Sealed Case*,
199 F.3d 522 (D.C. Cir. 2000)..................................................................22

*In re Sealed Case*,
931 F.3d 92 (D.C. Cir. 2019) (*Sealed Case I*) ..................... 7, 8, 9, 28, 29

*In re Sealed Case*,
971 F.3d 324 (D.C. Cir. 2020) (*Sealed Case II*).......................... 8, 31, 32

*James v. Jacobson*,
6 F.3d 233 (4th Cir. 1993) .................................................................8, 13

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. 25-3501, 2025 WL 2897654 (D.D.C. Oct. 10, 2025)......................34

*McDonald v. Smith*,
472 U.S. 479 (1985) .........................................................................39, 40

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .........................................................................41, 42

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) ...............................................................................41

*Nixon v. Warner Communications, Inc.*,
435 U.S. 589 (1978) .........................................................................25, 26

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .........................................................................43, 44

*Thomas v. Collins*,
323 U.S. 516 (1945) ...............................................................................40

**Statutes**

15 U.S.C. § 7215 ..........................................................................................5

15 U.S.C. § 7215(b)(4)(B)..........................................................................38

15 U.S.C. § 7215(b)(5)................................................................................19

15 U.S.C. § 7215(b)(5)(A)....................................................................16, 19

15 U.S.C. § 7215(c)(2) .........................................................................16, 19

15 U.S.C. § 7215(d) ............................................................... 17, 19, 27

15 U.S.C. § 78u(d) ........................................................................37

15 U.S.C. § 78u-6(h)(2) ...............................................................23

5 U.S.C. § 3331 ............................................................................19

**Other Authorities**

Board Ethics Code § EC5 ..............................................................17

Board Ethics Code § EC9 ..............................................................18

Board Rule 5108 ...........................................................................17

Board Rule 5440 ...........................................................................17

Carol Rice Andrews,
*A Right of Access to Court Under the Petition Clause of the First
Amendment: Defining the Right,*
60 OHIO ST. L. J. 557 (1999) ......................................................40

Complaint, *Doe v. McKernan,*
No. 24-cv-00488, ECF No. 1 (filed Feb. 21, 2024) .............................35

*Enforcement Actions,*
PCAOB (last visited Dec. 9, 2025) .................................................33

Eugene Volokh,
*The Law of Pseudonymous Litigation,*
73 HASTINGS L.J. 1353 (2022) ............................................... 14, 34

Gary Gensler, Chair, SEC,
Statement on PCAOB Rule on Withdrawal from Registration (Jan. 2,
2025) ........................................................................................33

Hester M. Peirce & Mark T. Uyeda,
*Nothing to See; Nothing to Say: Statement on Recent Whistleblower
Awards* (Sept. 19, 2024) ...............................................................23

James E. Pfander,
*Sovereign Immunity and the Right to Petition: Toward a First
Amendment Right to Pursue Judicial Claims Against the Government,*
91 NW. U. L. REV. 899 (1997) .......................................................40

Jayne S. Ressler,
  *Juror Privacy via Anonymity*,
  93 FORDHAM L. REV. 611 (2024) ........................................................12

Jayne S. Ressler,
  *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*,
  53 U. KAN. L. REV. 195 (2004) ..........................................................14

*Judicial Conference Policy on Privacy and Public Access to Electronic Case Files*,
  U.S. Courts (Mar. 2008) ....................................................................12

Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions*,
  106 HARV. L. REV. 1111 (1993) ..........................................................40

Scout Snowden,
  *Constitutional Law—The Erosion of Political Anonymity and Its Chilling Effect on Freedom of Association: Reconsidering the Constitutionality of the Mandated Public Disclosure of Individuals' Political Donations*,
  43 U. ARK. LITTLE ROCK L. REV. 303 (2020) ......................................43

Sen. Rep. No. 107-205 (July 3, 2002) .............................................. 19, 20

**Rules**

Fed. R. Civ. P. 26(c) ..........................................................................12

Fed. R. Civ. P. 5.2............................................................................12

Fed. R. Crim. P. 6(e) .................................................................... 12, 22

**Constitutional Provisions**

U.S. Const. amend. 1.........................................................................39

# GLOSSARY

Board      Public Company Accounting Oversight Board

SEC        Securities and Exchange Commission

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651. *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489-91 (2010); *Axon Enter., Inc. v. FTC and SEC v. Cochran*, 598 U.S. 175, 188-96 (2023). This Court has jurisdiction under the collateral order doctrine. *See Doe v. Hill*, 141 F.4th 291, 294-95 (D.C. Cir. 2025) (citing *In re Sealed Case*, 931 F.3d 92, 95 (D.C. Cir. 2019)). The district court issued the order being appealed from on August 2, 2024, and Plaintiff-Appellant Doe filed his notice of appeal on August 16, 2024.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Did the district court commit legal error or abuse its discretion in denying Doe's motion for leave to litigate pseudonymously?

## PERTINENT STATUTES AND REGULATIONS

The constitutional provisions, statutes, and regulations pertinent to the appeal are set forth in the Addendum at the end of this brief.

1

## STATEMENT OF THE CASE

Plaintiff-Appellant Doe's complaint, filed in the Northern District of Texas in January 2023,[2] seeks declaratory and injunctive relief to stop defendant Public Company Accounting Oversight Board (the "Board") from continuing an unlawful and unconstitutional prosecution of him in secret disciplinary proceedings ostensibly blessed by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). JA 015. The complaint alleges that the Board's prosecution violates the Constitution because, among other things, (1) it is funded in violation of Article I of the Constitution; (2) it is insufficiently supervised by a principal officer of the Executive Branch in violation of Article II; (3) the Board's assigned hearing officer is an inferior officer who was not appointed in conformity with the Appointments Clause of Article II of the Constitution; (4) the hearing officer also enjoys multiple levels of protection from removal by the President in violation of Article II of the Constitution; (5) the Board's disciplinary process is systemically biased, secretive, and unfair in

---

[2] The Texas district court, over Doe's objection, granted the Board's motion to transfer this case to the District of Columbia in March 2024. JA 047.

violation of the Due Process Clause of the Fifth Amendment to the Constitution; and (6) the Board's disciplinary process deprives Plaintiff of his right to a jury trial in an Article III court in violation of the Seventh Amendment to the Constitution. *Id.*

Contemporaneously with filing his complaint, Doe moved for leave to litigate the case pseudonymously. ECF No. 3. He renewed that motion in May 2024 after the case was transferred from the Northern District of Texas to the District of Columbia. ECF No. 66. The district court denied Doe's motion in a Memorandum Opinion and Order entered on August 2, 2024. JA 062. Doe filed a timely notice of appeal on August 16, 2024, ECF Nos. 76 and 80, and the district court granted Doe's motion to stay the effectiveness of its denial of pseudonymity pending appeal. ECF No. 78 and Minute Order dated September 26, 2024. The Board has twice moved for summary affirmance in this Court, and the Court has denied both motions.

The case is proceeding apace in the district court. Cross-motions for summary judgment have been filed, with briefing scheduled to be completed by early February 2026. Doe has remained anonymous

throughout, without any resulting disruptions, complications, or redactions needed to accommodate Doe's pseudonymity.

## SUMMARY OF ARGUMENT

The district court committed legal error and abused its discretion in denying Appellant Doe's motion to pseudonymously litigate this first-of-its-kind constitutional challenge to the Board's enforcement and disciplinary processes. As explained below, Doe has compelling privacy, reputational, statutory, and constitutional bases for proceeding pseudonymously, all of which the district court either underweighted or ignored entirely, whereas any conceivable public interest in knowing Doe's actual name is negligible. Moreover, Doe's true name—the only information he desires to keep out of public view in this case—has been known to the Board for many years, and it is entirely irrelevant to the merits of this case or to anyone's ability to understand the case or discern whether justice is being done. For this reason, the case has proceeded apace in the district court—pseudonymously—for nearly three years without any complications, disruptions, or need for redactions, and it is currently in the midst of summary judgment briefing in which Doe's name has played no role.

4

Pseudonymity is warranted here because of a clear statutory mandate that the identities of accountants accused of professional misconduct by the Board should not become public unless and until those claims are fully adjudicated or settled by the Board with the imposition of a final sanctions order. 15 U.S.C. § 7215. This strict statutory secrecy protects Board respondents—that is, accounting firms and their associated accountants—from the severe professional and reputational repercussions that would result from premature public disclosure of as-yet unproven allegations pending before the primary federal regulator of the public auditing profession.

This Court's five-factor test for pseudonymity—which is only a starting guidepost, not a checklist—further supports pseudonymity. Doe has strong privacy and reputational interests in maintaining his anonymity, which Congress has vindicated by statute. Doe is also seeking to protect his constitutional rights from being infringed by a quasi-governmental regulator and his name has no relation to the nature of his claims, which are focused entirely on the structure of the Board's disciplinary process. The Board already knows Doe's identity and is not prejudiced in any way by Doe's pseudonymity.

The irony of the Board's opposition to pseudonymity cannot be overstated. Since its creation nearly a quarter century ago, the Board has operated more secretively and less transparently than just about any other federal regulator in modern U.S. history. By statutory mandate, the vast majority of the Board's regulatory operations—performed by nearly 1,000 private citizens endowed in recent years with annual budgets exceeding $300 million—is concealed from public view, including nearly all the enforcement and disciplinary machinations complained of in this case. Indeed, in any enforcement case where the Board, for whatever reason, ultimately decides not to impose any sanction, the entire matter remains forever hidden from public view—including the name of the respondent, the names of the prosecutors, the Board's final decision, the Board's legal analysis and reasoning for declining to impose sanctions, and any preliminary or procedural rulings in the matter made by the Board or its hearing officer.

Yet now, in this case, the Board incongruously demands unconditional (and entirely gratuitous) public transparency when, for the first time ever, one of its enforcement targets has the temerity to ask a federal court to scrutinize the constitutionality of the Board's secret

6

enforcement and disciplinary processes. The Board has proffered no conceivable reason why the public would (or should) have any interest in knowing Appellant Doe's name, nor did the district court. The Board's demand that he gratuitously "out" himself as a precondition to challenging the Board's constitutionality is a transparent, *in terrorem* gambit designed to deter him—and others—from seeking judicial relief to protect their constitutional rights, and the Court should reject it.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court "review[s] 'de novo the criteria used by a district court to decide whether to grant a motion to proceed anonymously,' and … the 'application of those criteria' to the facts of a particular case for an abuse of discretion." *Doe v. Hill*, 141 F.4th 291, 295 (D.C. Cir. 2025) (quoting *In re Sealed Case*, 931 F.3d 92, 95 (D.C. Cir. 2019) ("*Sealed Case I*")). "An error of law is by definition an abuse of discretion." *Id.* (cleaned up; citations omitted).

### II.    APPLICABLE LEGAL PRINCIPLES

This Circuit's approach to pseudonymity is governed largely by three recent cases: *Sealed Case I*; *In re Sealed Case*, 971 F.3d 324 (D.C.

Cir. 2020) ("*Sealed Case II*"); and *Hill*.[3]  *Sealed Case I*—brought by a serial IRS whistleblower seeking millions in bounty payments from the public fisc—set forth the Court's first "clear guidance as to when a petitioner may proceed anonymously."  931 F.3d at 96-97.[4]  In doing so, the Court largely adopted the Fourth Circuit's reasoning in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), a case the Court had cited with approval on two previous occasions.  *See id.* (citations omitted).

Echoing *James*, the Court in *Sealed Case I* adopted a non-exclusive list of five factors that "serve well as *guideposts* from which a court ought to *begin* its analysis" of a pseudonymity request.  *Id.* at 97 (emphases added).  Those factors are:

[1] whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;

[2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties;

---

[3] All pseudonymity motions in the district court are decided by the chief judge.

[4] The Court in *Sealed Case I* also joined most other circuits in holding that denials of pseudonymity requests are subject to immediate appeal under the collateral order doctrine.  931 F.3d at 95-96 (citations omitted).

> [3] the ages of the persons whose privacy interests are sought to be protected;
>
> [4] whether the action is against a governmental or private party; and, relatedly,
>
> [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* (quoting *James*, 6 F.3d at 238).  The Court specifically added that this starting-point list was non-exhaustive and should not lead courts "to engage in a wooden exercise of ticking the five boxes."  *Id.* (citing *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189-90 (2d Cir. 2008)).  After setting forth the list, however, *Sealed Case I* ultimately held that the district court had abused its discretion in denying pseudonymity for reasons not tied to the five factors, reinforcing the Court's instruction that those five factors should not be applied mechanically.

Sealed Case II* and *Hill* further elaborated on the factors announced in *Sealed Case I*.  Both cases stressed that the pseudonymity analysis should be a "flexible and fact driven" one that starts with a presumption against pseudonymity and "ultimately depends on the totality of the circumstances," thereby allowing pseudonymity where "the interest in proceeding under a pseudonym outweighs the 'countervailing interests

in full disclosure.'"  *Hill*, 141 F.4th at 293 (quoting *Sealed Case II*, 971 F.3d at 326).

Proper application of this flexible analysis, and concomitant recognition of the chasm that separates the facts in *Sealed Case II* and *Hill* from those in this case, leave little doubt why pseudonymity was denied in those cases but is warranted here.

## III.   PSEUDONYMITY AND OPEN JUDICIAL PROCEEDINGS

All can agree with the aspirational default presumption that federal litigation should ordinarily be conducted in full public view.  But that default presumption, rooted in the common law and the First Amendment, has never meant that every jot and tittle in every court proceeding—from start to finish, civil or criminal—must be made fully available for public inspection.  Supreme Court precedent strongly suggests that the public interest in transparency is at its apex in *criminal* cases (largely driven by the Sixth Amendment's guarantee of a public trial), and, even in criminal cases, primarily at the trial stage and in related proceedings conducted *in the courtroom*.  *See generally Globe Newspaper Co. v. Superior Ct. for Norfolk*, 457 U.S. 596, 603-06 (1982) (explaining why "a right of access to *criminal trials* in particular is

10

properly afforded protection by the First Amendment" (emphasis in original)) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980)).[5]  Indeed, the Supreme Court has never explicitly extended this public access right to civil litigation (even for proceedings in open court), although this Court and others have done so.

Yet even in the criminal context, courts often restrict public access to all manner of court documents—and sometimes entire proceedings—*particularly* in cases of immense public interest.  They do so because those courts, or elected legislators and other policymakers, have determined that the public's default interest in access to information is outweighed by competing values such as preserving personal privacy, evidentiary privileges, investigative integrity, personal and professional reputations, the presumption of innocence, and other constitutional liberties.

For example, ancillary judicial proceedings that arise from grand jury proceedings are routinely conducted under seal, with large swaths

---

[5] The heightened public interest in criminal trials relative to civil proceedings is also evidenced by, among other things, courtroom attendance, media coverage, books, movies, and television shows.

11

of pertinent information of intense public interest redacted and otherwise concealed. *See generally* Fed. R. Crim. P. 6(e). The same is true when courts enter protective orders in civil litigation, allowing any number of presumptively public filings to be redacted or filed entirely under seal. *See generally* Fed. R. Civ. P. 26(c). Indeed, most personally identifiable information is now required to be redacted from court filings. Fed. R. Civ. P. 5.2. Likewise, concealing the identities of the key factfinders in both civil and criminal trials—*i.e.*, the jurors—is not uncommon, *especially* in cases of the most intense public interest. *See generally* Jayne S. Ressler, *Juror Privacy via Anonymity*, 93 FORDHAM L. REV. 611, 612-14 (2024) (citing recent examples); *Judicial Conference Policy on Privacy and Public Access to Electronic Case Files*, U.S. Courts (Mar. 2008), https://www.uscourts.gov/privacy-policy-electronic-case-files.

Even known wrongdoers sometimes manage to keep their identities hidden in court filings of great public interest. For example, the anonymization of unindicted co-conspirators is commonplace, as is the use of pseudonyms like "Tipper X" to hide the identities of certain participants in insider trading schemes. And consider how many

newsworthy securities fraud class action complaints feature the ubiquitous "CW-1" as a key confidential witness to alleged wrongdoing.

Along this continuum of tools courts use to conceal case information from the public, allowing a plaintiff to litigate under a pseudonym is arguably the least extreme. That is especially true where, as here, there is no conceivable public interest in knowing a plaintiff's real name, yet concealing it protects his strong privacy and constitutional interests (discussed below) without prejudicing the defendant or in any material way inhibiting the courts and the public from understanding the case or assuring themselves that justice is being done. Indeed, the Fourth Circuit recognized this reality in *James v. Jacobson*, the very opinion this Court found worthy of following in *Sealed Case I*. After noting that "anonymity in this case would be limited to the pseudonym that [the plaintiffs] use [and] not to who they are in every other respect," the *James* court reasoned that "it would seem to make no difference to a jury … whether the [plaintiff-]witness bore the name John Smith or Henry Williams." 6 F.3d at 241-42.

The Fifth Circuit made a similar observation in *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981):

13

Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name. These crucial interests served by open trials … are not inevitably compromised by allowing a party to proceed anonymously.

*Id.* at 185; *accord* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353, 1369 (2022) ("In principle, pseudonymity is less of a burden on public access than is sealing, or even redaction," and is "sometimes offered as a less public-access-restrictive alternative to outright sealing" (citing *Stegall*, 653 F.2d at 185)); Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. KAN. L. REV. 195, 219 (2004) (agreeing with *James* and noting that "the public loses nothing when a plaintiff is allowed to proceed pseudonymously but all the other facts and circumstances of the case remain in view," and thus that "public confidence in the judicial system need not suffer").

## IV.  PSEUDONYMITY IS WARRANTED HERE

The district court erred in denying Appellant Doe's motion to litigate pseudonymously. Given the nature of the claims he asserts, Doe's true name—the only information he has asked to conceal from public

14

view as his case otherwise proceeds in full public view in the ordinary course—is irrelevant to the court or any interested members of the public, and its concealment from public view will not in any way limit anyone's ability to understand the case or to monitor whether justice is being done. Indeed, in the district court, the parties are currently briefing cross-motions for summary judgment, with neither party's submissions thus far needing to redact a single filing or piece of evidence to obscure Doe's true name. Thus, any conceivable public curiosity in his name is trivial. And the Board will suffer no prejudice from pseudonymity because it already knows his name.

On the other hand, Doe has strong privacy and reputational interests in maintaining his anonymity. That interest includes avoiding premature public disclosure that the Board's private staff employees have leveled unproven accusations against him—which Doe considers false and defamatory—in a process over which Congress statutorily mandated strict secrecy. As detailed below, Congress made the deliberate policy choice to keep such unproven allegations secret unless and until they are tested and proved at a hearing and thereafter sustained in a final sanctions order issued by the Board at the conclusion

15

of the process. The accusations against Doe have not previously been leaked, and they will *never* become public if he either prevails in the Board proceeding or is granted pseudonymity and prevails in this proceeding.

In the subsections that follow, we explain in more detail these reasons and others for allowing pseudonymity here.

## A. The Statutory Confidentiality Mandates of Sarbanes-Oxley Favor Pseudonymity

All parties acknowledge that the Board proceeding Appellant Doe is challenging in this case is confidential pursuant to statutory mandates imposed by Congress when it created the Board. Litigated Board disciplinary proceedings like the one pending against Doe remain nonpublic unless, among other things, the respondent consents to a public proceeding—something that did not happen in this case and, unsurprisingly, has never happened since the Board was created in 2002. 15 U.S.C. § 7215(c)(2). *See* ECF 110-2, at 11. Similarly, documents and other information prepared or received by (or specifically for) the Board and its personnel during its inspections and investigations are protected by strict confidentiality protections. *See* 15 U.S.C. § 7215(b)(5)(A). The

16

very existence of the Board's disciplinary proceeding, as well as its outcome, remains secret unless and until the five SEC-appointed Board members ultimately issue a final decision in the case. Even then, secrecy is maintained unless, at the conclusion of the entire process—which typically takes several years to run its full course—the Board imposes a final disciplinary sanction against the accused respondent. *See id.* § 7215(d). Thus, if no final sanction is imposed after years of secret investigation and secret disciplinary litigation, the matter *never* becomes public and is effectively sealed forever.

In furtherance of this statutory mandate to preserve the confidentiality of accountants' identities at this stage of a proceeding, the Board itself has also promulgated rules that similarly require strict confidentiality of its proceedings. *See, e.g.*, Board Rule 5108 (confidentiality of investigatory records); Board Rule 5440 (forbidding purchase of hearing transcript by a nonparty to the proceeding); Board Ethics Code § EC5 (Board members and staff may not "disseminate or otherwise disclose any confidential, non-public information obtained by virtue of their position with the Board, regardless of whether that

17

information may be considered to be 'material' under the securities laws"); Board Ethics Code § EC9 (similar).

As Congress intended in Sarbanes-Oxley, this strict statutory secrecy protects Board respondents—that is, accounting firms and their associated accountants—from the severe professional and reputational repercussions that would result from premature public disclosure of as-yet unproven allegations pending before the primary federal regulator of the public auditing profession. These unproven allegations are the handiwork of non-governmental Board staff employees who are subject to *none* of the statutory and other guardrails that constrain the prosecutorial discretion and power of governmental employees and agencies, such as the Administrative Procedure Act, the Sunshine Act, the Privacy Act, the Freedom of Information Act, the Paperwork Reduction Act, and countless others. The Board has admitted in discovery that the private staff employees responsible for these unproven allegations against Appellant Doe are not even required to take an oath— similar to the one required of all governmental employees—to "support and defend the Constitution of the United States" and to "bear true faith

18

and allegiance to the same." ECF No. 110-2, at 8. *See generally* 5 U.S.C. § 3331.

Congress was keenly aware that public disclosure of as-yet unproven Board staff charges against an accountant could unfairly inflict immediate and irreparable damage on the accountant's reputation and career. For that reason, it purposefully included strong safeguards to ensure that the identity of accountants subject to Board enforcement and disciplinary proceedings would remain confidential unless and until the Board completes all adjudicative processes and reaches a final decision finding the charges proven to its satisfaction by the available evidence. *See* 15 U.S.C. § 7215(b)(5), (c)(2), (d). The Senate emphasized the importance of these strict confidentiality protections when it first drafted them, stressing that "information gathered by Board investigators should be 'privileged from outsiders'" and "[t]he Board's investigative activities and any information gathered in the course of an investigation are to be *confidential and privileged for all purposes* (including civil discovery) until particular information is presented in connection with a public proceeding." Sen. Rep. No. 107-205, at 10, 48 (July 3, 2002) (emphasis added); *accord* 15 U.S.C. § 7215(b)(5)(A), (c)(2).

The district court held that Appellant Doe's case is the type of "public proceeding" that dissolves the strict confidentiality safeguards otherwise mandated by Sarbanes-Oxley, but that was error. Congress clarified that confidentiality is relinquished only in public *enforcement* proceedings, that is, one in which the respondent consents to a public hearing, settles the proceeding with a final Board sanction, or appeals an adverse final Board decision to the SEC:

> The legislation [Sarbanes-Oxley] should have little additional impact upon the privacy of particular individuals. Information and documents held by the Public Company Accounting Oversight Board … *are generally confidential and privileged until made public in connection with a particular public **enforcement** proceeding*.

Sen. Rep. No. 107-205, at 58 (emphasis added). In such a "public enforcement proceeding," the Board has already made a final determination of wrongdoing, diminishing concerns about unfairly and prematurely damaging an accountant's career and reputation. The instant case, by contrast, is *not* a public enforcement proceeding. The Board has *not* made any final determination of wrongdoing, and Appellant Doe should be entitled at this stage of the Board's nonpublic

proceeding to preserve the confidentiality protections Congress purposefully wrote into Sarbanes-Oxley.

The strength and breadth of these statutory and regulatory confidentiality protections, and the important public policy concerns they reflect, should weigh heavily in favor of allowing Appellant Doe, a respondent charged in an otherwise nonpublic Board disciplinary proceeding, to challenge the structural constitutional legitimacy of that proceeding without being required prematurely to "out" himself and suffer the immediate, irreparable reputational and career damage that Congress labored so hard to prevent. *Doe v. MIT*, 46 F.4th 61 (1st Cir. 2022), is instructive on this point. There, the First Circuit provided thoughtful and comprehensive insight into the kinds of "paradigm" cases in which parties should be permitted to litigate pseudonymously. Appellant Doe's case fits squarely into one of those paradigms— specifically, suits "that are bound up with a prior proceeding made confidential by law." *Id*. at 71-72. As the court explained, "[t]his concern manifests itself when denying anonymity in the new suit would significantly undermine the interests served by that confidentiality." *Id*.

21

In similar regard, the statutorily mandated secrecy of Board proceedings bears substantial resemblance to the secrecy mandated by rule (rather than statute) for grand jury proceedings. *See generally* Fed. R. Crim. P. 6(e). Ancillary judicial proceedings arising from grand jury proceedings, in this Court and elsewhere, not only routinely conceal the identities of those involved but also seal significant portions of the court proceedings from public view entirely. *See generally In re Sealed Case*, 199 F.3d 522, 525-26 (D.C. Cir. 2000) ("mandatory public docketing of grand jury ancillary [court] proceedings is virtually unknown in the federal courts" and such proceedings "operate under a strong presumption of secrecy" (collecting cases)); *In re Sealed Case*, 121 F.3d 729, 757 (D.C. Cir. 1997) ("a district court can ensure that secrecy is protected by provisions for sealed, or when necessary *ex parte*, filings"); *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 502-04 (D.C. Cir. 1998) (rejecting First Amendment right of access to grand jury ancillary court proceedings). In Sarbanes-Oxley, Congress made the purposeful legislative and policy choice to impose comparable secrecy in Board proceedings. So, it should be uncontroversial to allow an accountant facing wholly unproven staff accusations in an otherwise secret Board

22

proceeding to seek judicial relief from that proceeding using a pseudonym, especially when everything else about his case will proceed in full public view in the normal course.

Congress made a similar secrecy choice several years later in the Dodd-Frank Wall Street Reform and Consumer Protection Act, which requires the identities of corporate whistleblowers to be concealed from public view. *See* 15 U.S.C. § 78u-6(h)(2). Because of this provision, SEC proceedings to assess and decide whistleblower award claims are conducted in tight secrecy, and SEC's written decisions are heavily redacted to conceal whistleblowers' identities, even though those whistleblowers typically seek payments of substantial sums of money from the public fisc based on SEC cases of substantial public interest. *See generally* Hester M. Peirce & Mark T. Uyeda, *Nothing to See; Nothing to Say: Statement on Recent Whistleblower Awards* (Sept. 19, 2024), https://www.sec.gov/newsroom/speeches-statements/peirce-uyeda-statement-whistleblower-091924.

Even when disappointed whistleblower-claimants file ancillary *judicial* proceedings to challenge SEC's award decisions, those cases are routinely litigated under pseudonyms in this Court and elsewhere, from

beginning to end, without controversy and typically with the consent of all parties. *See, e.g., Doe v. SEC*, 114 F.4th 687 (D.C. Cir. 2024); *Doe v. SEC*, No. 23-1161, 2024 WL 1208353 (D.C. Cir. Mar. 21, 2024), *reh'g denied*, 2024 WL 2059561 (D.C. Cir. May 7, 2024), *cert. denied*, 145 S. Ct. 462 (2024) (mem.); *Doe v. SEC*, No. 22-mc-80301-LB, 2023 WL 2351653 (N.D. Cal. Mar. 4, 2023); *Doe v. SEC*, No. 21-2537, 2022 WL 16936098 (2d Cir. Nov. 15, 2022); *Doe v. SEC*, 28 F.4th 1306 (2022); *In re John Doe*, No. 19-1095 (D.C. Cir., June 11, 2019) (Order granting leave to proceed under a pseudonym); *Doe v. SEC*, 729 F. App'x 1 (2018).[6]  That is so even though some whistleblowers have engaged in misconduct themselves, such that information about their identities and actions may be essential to fully understand the case and whether justice was done.  In one recent case, this Court's published opinion shielded not just the identity of the

---

[6] It is no answer to speculate that *all* these SEC whistleblowers were automatically entitled to pseudonymity simply because *some* whistleblowers *sometimes* fear retaliation if their identity is revealed. These judicial proceedings typically take place many years after the whistleblower came forward (and in many cases years after they have left the relevant company), and the pseudonymity requests and grants in these cases are typically *pro forma*, with few if any whistleblowers required to articulate or prove any well-grounded fear of actual retaliation.

whistleblower but also the identities of a company and individual the SEC had previously sued for fraud and obtained judgments against in a related public judicial proceeding, presumably because that information might indirectly reveal the whistleblower's identity. *Doe v. SEC*, 114 F.4th 687 (D.C. Cir. 2024).

Also instructive is the Supreme Court's decision in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978). There, certain media outlets sought physical copies of tape recordings that had already been played in open court during a prominent criminal trial of several of former President Nixon's advisers, written transcripts of which the court had already furnished to both the jurors and court spectators. Despite the intense public interest in the case and the prior release of the transcripts, the Court sustained the district court's decision to deny public release of copies of the physical tape recordings. *Id.* at 602-08. Why? Because Congress had enacted a statute (the Presidential Recordings Act) that "created an administrative procedure for processing and releasing to the public, on terms meeting with congressional approval, all of [President Nixon's] Presidential materials of historical interest, including the recordings of the conversations at issue here." *Id.* at 603. And it did not

25

matter to the Court that the literal terms of the relevant statute covered only *originals* of presidential recordings (not copies), *see id.* at 603 & n.15; what mattered was that Congress had statutorily provided "an alternative means" that was "the most appropriate means of assuring public access to the material, subject to prescribed safeguards," *id.* at 603-06. The availability of such an alternative statutory mechanism "tips the scales in favor of denying release" to the public, such that the Court "need not decide how the balance would be struck" if it were to have weighed various competing factors otherwise relevant to the decision concerning release of the tapes. *Id.* at 603-06.

So too here. Congress has statutorily provided a similar "alternative" and "most appropriate" means of disclosing Appellant Doe's true name to the public at a time, and under circumstances, that Congress has chosen to strike the right balance between a Board- accused accountant's privacy and reputation, on the one hand, and the public's right to know the accountants name, on the other. In addition to the strict secrecy provisions previously discussed, the statute provides that only after the Board completes its process, and only "[i]f the Board imposes a disciplinary sanction, ... the Board shall report the sanction to

26

... the public," and that public report is the statutorily permitted time, place, and manner by which "the name of the sanctioned person" is first disclosed. 15 U.S.C. § 7215(d). Just as in *Nixon*, the district court should have allowed Doe's name to remain nonpublic instead of short-circuiting the explicit, orderly statutory process that Congress chose for publicly revealing the name of a Board respondent.

Unlike the broad redactions and sealing orders that routinely conceal vast swaths of information from public view even in criminal cases of intense public interest, and unlike the prevalence of both pseudonymous pleading *and* heavy redactions in SEC whistleblower cases, Appellant Doe seeks no more than to keep his true name out of public view unless and until that point in the underlying Board disciplinary proceeding that Congress has determined is appropriate for public disclosure. The district court's denial of that modest request under the circumstances of this case was legally erroneous and an abuse of discretion.

## B. The *Sealed Case I* Factors Favor Pseudonymity

Only three of the five *Sealed Case I* factors are applicable here, because Doe has no present fear of retaliation by the Board or anyone

27

else (Factor 2) and because he is not a minor (Factor 3). The district court concluded that the inapplicability of these two factors meant those factors "add further weight to the scale supporting disclosure" and disfavoring pseudonymity, JA 067, but that approach contravenes this Court's admonition that courts should consider "the factors relevant to the case before it" and refrain from "engag[ing] in a wooden exercise of ticking the five boxes." *Sealed Case I*, 931 F.3d at 97. While the *presence* of those factors in any given case might "add further weight to the scale" in favor of pseudonymity, their absence adds no weight to either side of the scale because they are not "relevant to the case before [the court]." *Id.*

That leaves Factors 1, 4, and 5. The Board concedes that Factor 5 supports pseudonymity because it has known Appellant Doe's true identity all along, and the district court accepted that concession. So, that leaves Factors 1 and 4. Both factors favor pseudonymity in this case.

### Factor 1 (privacy interest)

As previously noted, Doe has a strong privacy and reputational interest in maintaining his anonymity. There's no credible basis to suggest that his desire for anonymity "is merely to avoid the annoyance

28

and criticism that may attend any litigation." *Id.* at 97. To the contrary, he wants to preserve the statutory protection of his privacy and reputation that Congress purposefully gave him when it enacted Sarbanes-Oxley, as detailed above. That statutory protection distinguishes Doe's case from nearly all others in which pseudonymity was denied—including *Sealed Case II* and *Hill*—and it powerfully reinforces this Court's repeated acknowledgment in other contexts that people have an "obvious privacy interest … in keeping secret the fact that they were subjects of a law enforcement investigation." *Citizens for Resp. & Ethics in Wash. v. DOJ*, 854 F.3d 675, 682 (D.C. Cir. 2017) (quoting *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995)); *accord id.* at 679 (people "have a substantial privacy interest in preventing disclosure of their names in law enforcement files") (quoting *Citizens for Resp. & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1092 n.3 (D.C. Cir. 2014)).

This Court's decisions in *Sealed Case II* and *Hill* further reinforce, by comparison and contrast, the strength of Doe's privacy interest here. In *Hill*, the plaintiff seeking pseudonymity was a convicted felon seeking a lucrative public benefit from taxpayers in the form of a government job

29

with a financial regulator.  141 F.4th at 294.  The Court explained that "a privacy interest rests 'in part on the degree of dissemination of the allegedly private fact[.]'"  *Id.* at 295 (quoting *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)).  Because the plaintiff's felony trial and conviction had been matters of public record for many years and could still be easily discovered through a Google search even though the plaintiff was later pardoned and had his conviction sealed, the Court found his privacy interest relatively weak.  *Id.* at 295-96.  That privacy interest was even weaker because the processes that enabled him to get his pardon and to seal his conviction were also matters of public record.  *Id.* at 296.  And he could not cite any statute to support his plea for privacy.

Doe's circumstances here are exactly the opposite of those in *Hill*, and far more compelling.  Doe is not a convicted felon; he has not yet been found guilty of *anything* and maintains his innocence.  He is the subject of unproven allegations made by private citizens who are neither employed nor supervised by any government prosecutor.  He is not seeking any benefit from taxpayers; he seeks judicial relief essentially to be left alone.  The nonpublic Board proceeding Doe seeks to stop through

30

this lawsuit has *never* been a matter of public record, and it might never become public. And, as previously discussed, Doe *can* and *does* cite a federal statute that guarantees his anonymity unless and until the Board completes its nonpublic processes and issues a final order that adjudges him guilty and imposes a sanction against him.

*Sealed Case II* is equally instructive in confirming the strength of Doe's privacy interest here. There too, the plaintiff sought a public benefit from the government in the form of a small-business hardship exemption from certain statutory mandates involving renewable fuels. Indeed, the plaintiff in *Sealed Case II* was not even a human being, but rather a company doing business as an oil refinery, leading the Court to question "whether companies even have 'personal' privacy rights beyond the traditional privileges for confidential business documents, attorney-client communications and work product, and trade secrets." 971 F.3d at 327 (citation omitted). And any information falling within those "traditional privileges" was adequately shielded by a joint protective order. *Id.*

The Court also found unpersuasive the company's asserted fear of competitive harm if its need to seek the hardship exemption became

public, but for reasons wholly inapplicable in the present case. The Court cited statistics showing that more than 80 percent of small refineries had applied for the same exemption, thus dispelling any concern about stigma or competitive harm from public disclosure that the plaintiff refinery was seeking one too. *Id.* at 328. Finally, the Court noted that other small refineries had filed similar judicial challenges to exemption denials in their own names without seeking pseudonymity, thus dispelling concerns that denial of pseudonymity might chill others from seeking judicial relief. *Id.* at 329-30.

Again, all of this is the opposite of what Doe is confronting. Doe is a flesh-and-blood human being who is not seeking any public benefit. And premature public disclosure that the Board's private staff seeks to discipline and penalize him would instantly brand him an outlier—"damaged goods"—among accounting professionals, even if that universe were limited to those within the Board's regulatory reach. More than 1,500 accounting firms (including all of the "Big Four" and second-tier firms), comprised of innumerable individual accountants and other "associated persons" across the globe, fall within the Board's regulatory

32

reach,[7] yet the Board has issued fewer than 550 final disciplinary orders in its entire 23-year history, and fewer than 30 of those orders resulted from adjudicated (*i.e.*, non-settled) disciplinary proceedings like the one now pending against Doe.[8] Moreover, during that near quarter-century, no lawsuits have similarly challenged the constitutionality of a pending Board disciplinary proceeding without an accompanying request for pseudonymity. All such lawsuits (two of which remain pending, including this one and its consolidated counterpart in the district court) have been filed pseudonymously.

---

[7] Gary Gensler, Chair, SEC, Statement on PCAOB Rule on Withdrawal from Registration (Jan. 2, 2025), https://www.sec.gov/newsroom/speeches-statements/gensler-pcaob-withdrawal-registration-010225-statement-pcaob-rule-withdrawal-registration. For much of its 23-year history, the number of registered firms was well over 2,000.

[8] *See generally Enforcement Actions*, PCAOB, https://pcaobus.org/oversight/enforcement/enforcement-actions (last visited Dec. 9, 2025); Board's Statement of Material Facts Not in Dispute and Counterstatement of Disputed Facts, ECF No. 110-2, at 11 (filed Nov. 25, 2025) (admitting that the Board "has publicly issued more than 500 final sanctions orders against Board-registered firms and associated persons" and that of those orders, "28 were issued after an adjudicated proceeding").

### *Factor 4 (governmental defendant)*

For purposes of this appeal, all parties agree that the Board should be treated as part of the government. Courts are split over whether the governmental status of a defendant weighs in favor of or against allowing a plaintiff to sue pseudonymously. *See generally* Volokh, *supra* at 1392-93 (citing cases and suggesting agreement with courts favoring pseudonymity in such circumstances, particularly where a plaintiff raises a purely legal challenge and his identity is not relevant to that challenge). Here, the district court weighed the Board's quasi-governmental status decidedly against pseudonymity, relying principally on *Sealed Case II. See* JA 067-68. In doing so, it did not have the benefit of this Court's more recent decision in *Hill,* which removed all doubt that, in a case like this one, the Board's quasi-governmental status should weigh *in favor of* pseudonymity—not against it.[9]

---

[9] The district court more recently has held that this factor *supported* pseudonymity in a case where institutional plaintiffs are seeking *nationwide class action relief* against the country's largest federal law enforcement agency on behalf of an innumerable class comprised of "[a]ll United States citizens and lawful permanent residents" whose sensitive personal information was transferred to the agency from another federal

*Hill* clarified that the governmental status of a defendant "is not a binary factor that always tips one way or the other," but rather depends on "the nature of the claims raised and relief sought." 141 F.4th at 298-99. There, for example, the convicted-felon-plaintiff sought to have a federal statute declared facially unconstitutional, along with a sweeping injunction that would prohibit the government from enforcing the statute against anyone, anywhere, ever. *Id.* at 299.[10] He also asserted an as-applied challenge, but adjudication of that claim would necessarily "turn[] upon individualized factors and information about [the plaintiff's] circumstances and relevant characteristics." *Id.* Thus, "information about the plaintiff's identity and his trustworthiness notwithstanding his

agency. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-3501, 2025 WL 2897654, at *3 (D.D.C. Oct. 10, 2025); *see also Doe v. U.S. Citizenship & Immigr. Servs.*, No 25-3481, 2025 WL 2851639, at *2 (D.D.C. Oct. 8, 2025) (pseudonymity allowed, and favored because the plaintiff was "suing a government defendant and seeking individualized relief") (citing cases).

[10] Although this Court's opinion did not mention it, the plaintiff in *Hill* was also demanding unspecified punitive damages, presumably to be paid from the public fisc. *See* Complaint, *Doe v. McKernan*, No. 24-cv-00488, ECF No. 1, at 28 (filed Feb. 21, 2024). And as previously noted, his ultimate goal was to obtain a broader public benefit in the form of a government job.

felony convictions [sat] at the heart of [his] as-applied constitutional challenge." *Id.* All of this, the Court explained, put the case "at the apex of public interest." *Id.*

None of that is true in the present case. Here, Appellant Doe seeks far more modest, individualized, and self-protective relief that would have no direct impact on any statute or the public fisc, much less prevent the government from ever enforcing the statute against anyone else. Specifically, Doe's complaint seeks only to enjoin the Board "from continuing its unlawful and unconstitutional disciplinary proceedings *against Plaintiff,*" along with a declaration "that the Board's disciplinary proceedings *against Plaintiff* are unlawful and unconstitutional." JA 044 (emphasis added). Unlike the plaintiff in *Hill*, Appellant Doe seeks no damages in this case and is *not* asking the court to strike down any federal statute as facially unconstitutional. Moreover, the relief he seeks would impose no direct prohibition on the Board's ability to investigate and discipline other accountants and firms, especially those located

36

outside the District of Columbia.[11]  While a ruling in Doe's favor might cause other litigants to raise their own similar challenges and persuade other courts to rule similarly, that is true in any case of first impression and should not, standing alone, elevate the public interest in this particular case.

Even if Appellant Doe were to obtain all the relief he seeks in this case, the Board could also continue to discipline other accountants and firms in any circuit through consent settlements and defaults, which is how the Board has resolved the overwhelming majority of its enforcement matters over the past 20-plus years.  *See supra* fn. 8 and accompanying text.  Moreover, the Board could—especially in conjunction with the SEC—undoubtedly devise a lawful and constitutional alternative process for seeking penalties and other relief against the few accountants and firms who choose to defend themselves, such as referring those cases to the SEC for prosecution in federal district courts.  *See* 15 U.S.C. § 78u(d)

---

[11] According to the Board's public website, only one of the approximately 1,500 Board-registered accounting firms is headquartered in the District. *See* https://pcaobus.org/oversight/registration/registered-firms?firmcity=Washington.

(authorizing SEC to seek injunctions, penalties, and other relief against those who violate, among other things, the rules of the Board); *id.* § 7215(b)(4)(B) (authorizing the Board to refer its investigations to SEC or others). In short, the enforcement sky will not fall if Doe wins this case, and the limited individualized relief he seeks puts this case nowhere near the "apex" of public interest.

In any event, unlike in *Hill*, nothing about Appellant Doe's identity or characteristics—least of all his name—is of any conceivable public interest other than his status as a respondent in a pending Board disciplinary proceeding. He is not a public figure. His name has no relevance to the proper disposition of this case and is entirely unnecessary for the public to understand this case or to discern whether justice is being done in this litigation. Neither the district court nor the Board has articulated any reason why revealing Doe's true name would enhance the public's ability to understand this case or to assess whether justice is being done. There is none.[12]

---

[12] The district court also erroneously considered the public's interest in the overall case, but the relevant balance should focus only on the public's

Although not relevant in *Hill*, there is another compelling reason why pseudonymity is particularly appropriate in cases like this one, which seek to stop governmental actors from continuing to inflict allegedly unconstitutional harm on a plaintiff in violation of his civil liberties. In this type of case, any *implied* right of public access to pretrial civil court proceedings must be weighed against the plaintiff's *express* individual right, under the First Amendment, "to petition the Government for a redress of grievances." U.S. Const. amend. 1.

The Supreme Court has repeatedly confirmed that the right of access to the courts is an aspect of the First Amendment right protected by this Petition Clause. *See, e.g.*, *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972); *accord McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("filing a complaint in court is a form of petitioning activity" (citing *Bill Johnson's Restaurants* and *California Motor Transport*)). Indeed, as one commentator has explained, "a lawsuit

interest in the tiny kernel of information being withheld from public view—here, whether the public would care about Doe's actual name. The answer here is obviously no.

39

filed against the government deserves the *greatest* protection under the Petition Clause." Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions*, 106 HARV. L. REV. 1111, 1118 (1993) (emphasis added); *accord* James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 NW. U. L. REV. 899, 901 (1997) ("History and context confirm that the Petition Clause guarantees the right of individuals to pursue judicial remedies for government misconduct."). At times, the Court has suggested that this fundamental right is also encompassed within the constitutional protections for due process of law and privileges and immunities. *See generally* Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 OHIO ST. L. J. 557, 562-71 (1999) (discussing cases).

As an explicit and fundamental First Amendment right, the right to petition is as precious as the "cognate" and "inseparable" other rights guaranteed by the same amendment, including freedom of speech, press, and assembly. *Thomas v. Collins*, 323 U.S. 516, 530 (1945); *see also McDonald,* 472 U.S. at 482-83 (although not "absolute," the right to

40

petition is "an important aspect of self-government," is "cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression"). Just like those other precious First Amendment rights, the right to petition should not be infringed, chilled, or inhibited absent compelling reasons justified under strict or exacting scrutiny. Of particular relevance here, the Supreme Court has struck down governmental restrictions on pseudonymous activity precisely because those restrictions might chill or discourage people from exercising their core First Amendment rights. *See, e.g., Americans for Prosperity v. Bonta*, 594 U.S. 595, 598 (2021) (striking down tax regulation requiring nonprofit organizations to disclose donors' identities because it "imposes a widespread burden on donors' associational rights"); *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 200 (1999) (striking down law requiring display of name badge when circulating a petition because it "discourages participation in the petition circulation process by forcing name identification without sufficient cause"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (striking down law prohibiting anonymous pamphleteering); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) (reversing state

41

court judgment requiring disclosure of civil-rights organization's membership list because compelled disclosure would chill First Amendment right of association); *see also Doe v. MIT*, 46 F.4th at 71 (pseudonymity appropriate for "cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated").

In these cases, moreover, the Court has rejected any suggestion that there is something sneaky or dishonorable about seeking to correct governmental defects or abuse while remaining anonymous. For example, the Court observed in *McIntyre* that insisting on anonymity while seeking political change is "not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority." 514 U.S. at 357. Indeed, this country has a long tradition of pseudonymous public advocacy, starting most obviously with the Federalist Papers written by "Publius" to convince their fellow countrymen to support ratification of the Constitution. Opposing Publius were equally committed pseudonymous authors including "Cato," "Centinel," "The Federal Farmer," and "Brutus." *See id.* at 360-68 (Thomas, J., concurring in the judgment)

42

(recounting the long history and tradition of pseudonymous advocacy); *see also* Scout Snowden, *Constitutional Law—The Erosion of Political Anonymity and Its Chilling Effect on Freedom of Association: Reconsidering the Constitutionality of the Mandated Public Disclosure of Individuals' Political Donations*, 43 U. ARK. LITTLE ROCK L. REV. 303, 304 (2020) (discussing pseudonymity in First Amendment cases under header proclaiming that "Anonymity is as American as Apple Pie").  It is no exaggeration to say that Americans made one of the most consequential public policy decisions in world history without knowing the true identities of these competing advocates.

The district court accorded little or no weight to Appellant Doe's compelling privacy and constitutional rights in determining that Doe had not overcome the default presumption in favor of public access to court proceedings.  This Court should correct that error and reverse.

### C. Appellant Doe's Likelihood of Success on the Merits Favors Pseudonymity

The district court summarily rejected, "for lack of support," Appellant Doe's contention that his case for pseudonymity is strengthened due to his likelihood of success on the merits of his claim

that, in light of *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Board is depriving Doe of his Seventh Amendment right to a jury trial in an Article III court. JA 071. *Jarkesy* held that an administrative enforcement proceeding in which the Securities and Exchange Commission imposed civil monetary penalties and other relief, including industry bars—the same types of relief sought by the Board in its non-jury disciplinary proceeding against Plaintiff—unconstitutionally deprived the respondents of their right to an Article III adjudication and their Seventh Amendment right to trial by jury. *Id.* at 140-41. The parties are in the midst of summary judgment briefing of these issues in the district court, and the present appeal is not the appropriate venue to brief the impact of *Jarkesy* on Doe's nearly identical Article III and Seventh Amendment claims. Doe respectfully suggests, however, that his likelihood of ultimate success on those claims, which would presumably require the Board to dismiss its pending disciplinary proceeding against him without it ever becoming public, strongly favors allowing Doe to litigate this case pseudonymously, and that the district court therefore erred in disregarding this factor entirely.

44

## CONCLUSION

The district court's August 2, 2024 Memorandum Opinion and Order denying Appellant Doe leave to litigate his case pseudonymously should be reversed.

Dated: March 23, 2026

Ian D. Roffman
Melanie V. Woodward
NUTTER MCCLENNEN & FISH LLP
Seaport West
155 Seaport Blvd.
Boston, MA 02210
(617) 439-2421
iroffman@nutter.com

Respectfully submitted,

s/ *Russell G. Ryan*

Russell G. Ryan
(*Counsel of Record*)
(DC Cir. Bar No. 42101)
Casey Norman
Mark Chenoweth
New Civil Liberties Alliance
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains fewer than 13,000 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ *Russell G. Ryan*
Russell G. Ryan

*Counsel for Plaintiff-Appellant*
*John Doe*

46

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, I electronically filed the foregoing brief, including the addendum that follows this page, with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ *Russell G. Ryan*
Russell G. Ryan

*Counsel for Plaintiff-Appellant*
*John Doe*

47

*Doe v. PCAOB*
*Case No. 24-5195*

# PLAINTIFF-APPELLANT'S ADDENDUM OF
# RELEVANT CONSTITUTIONAL PROVISION AND STATUTE

Table of Contents

Page

**I.**  **Constitutional Provision**

First Amendment                                     1

**II.**  **Statute**

15 U.S.C. § 7215                                    1

*Doe v. PCAOB*
*Case No. 24-5195*

# PLAINTIFF-APPELLANT'S ADDENDUM OF RELEVANT CONSTITUTIONAL PROVISION AND STATUTE

Table of Contents

| | | Page |
|---|---|---|
| **I.** | **Constitutional Provision** | |
| | Amendment I | 1 |
| **II.** | **Statute** | |
| | 15 U.S.C. § 7215 | 1 |

*Doe v. PCAOB*
Case No. 24-5195

## I.    RELEVANT CONSTITUTIONAL PROVISION

### First Amendment

Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances.

## II.    RELEVANT STATUTE

### 15 U.S.C. § 7215 – Investigations and disciplinary proceedings

### (a)    In general

The Board shall establish, by rule, subject to the requirements of this section, fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms.

### (b)    Investigations

### (1)    Authority

In accordance with the rules of the Board, the Board may conduct an investigation of any act or practice, or omission to act, by a registered public accounting firm, any associated person of such firm, or both, that may violate any provision of this Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under this Act, or professional standards, regardless of how the act, practice, or omission is brought to the attention of the Board.

### (2)   Testimony and document production

In addition to such other actions as the Board determines to be necessary or appropriate, the rules of the Board may—

(A)   require the testimony of the firm or of any person associated with a registered public accounting firm, with respect to any matter that the Board considers relevant or material to an investigation;

(B)   require the production of audit work papers and any other document or information in the possession of a registered public accounting firm or any associated person thereof, wherever domiciled, that the Board considers relevant or material to the investigation, and may inspect the books and records of such firm or associated person to verify the accuracy of any documents or information supplied;

(C)   request the testimony of, and production of any document in the possession of, any other person, including any client of a registered public accounting firm that the Board considers relevant or material to an investigation under this section, with appropriate notice, subject to the needs of the investigation, as permitted under the rules of the Board; and

(D)   provide for procedures to seek issuance by the Commission, in a manner established by the Commission, of a subpoena to require the testimony of, and production of any document in the possession of, any person, including any client of a registered public accounting firm, that the Board considers relevant or material to an investigation under this section.

**(3)    Noncooperation with investigations**

**(A)    In general**

If a registered public accounting firm or any associated person thereof refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation under this section, the Board may—

(i)    suspend or bar such person from being associated with a registered public accounting firm, or require the registered public accounting firm to end such association;

(ii)    suspend or revoke the registration of the public accounting firm; and

(iii)    invoke such other lesser sanctions as the Board considers appropriate, and as specified by rule of the Board.

**(B)    Procedure**

Any action taken by the Board under this paragraph shall be subject to the terms of section 7217(c) of this title.

**(4)    Coordination and referral of investigations**

**(A)    Coordination**

The Board shall notify the Commission of any pending Board investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the work of the Commission's Division of Enforcement, as necessary to protect an ongoing Commission investigation.

3

### (B)    Referral

The Board may refer an investigation under this section—

(i)    to the Commission;

(ii)    to a self-regulatory organization, in the case of an investigation that concerns an audit report for a broker or dealer that is under the jurisdiction of such self-regulatory organization;

(iii)    to any other Federal functional regulator (as defined in section 6809 of this title), in the case of an investigation that concerns an audit report for an institution that is subject to the jurisdiction of such regulator; and

(iv)    at the direction of the Commission, to—

(I)    the Attorney General of the United States;

(II)    the attorney general of 1 or more States; and

(III) the appropriate State regulatory authority.

### (5)    Use of documents

(A)    Confidentiality

Except as provided in subparagraphs (B) and (C), all documents and information prepared or received by or specifically for the Board, and deliberations of the Board and its employees and agents, in connection with an inspection under section 7214 of this title or with an investigation under this section, shall be confidential

4

and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process) in any proceeding in any Federal or State court or administrative agency, and shall be exempt from disclosure, in the hands of an agency or establishment of the Federal Government, under the Freedom of Information Act (5 U.S.C. 552a),[1] or otherwise, unless and until presented in connection with a public proceeding or released in accordance with subsection (c).

(B)    Availability to Government agencies

Without the loss of its status as confidential and privileged in the hands of the Board, all information referred to in subparagraph (A) may—

(i)    be made available to the Commission; and

(ii)    in the discretion of the Board, when determined by the Board to be necessary to accomplish the purposes of this Act or to protect investors, be made available to—

(I)    the Attorney General of the United States;

(II)    the appropriate Federal functional regulator (as defined in section 6809 of this title), other than the Commission, and the Director of the Federal Housing Finance Agency, with respect to an audit report for an institution subject to the jurisdiction of such regulator;

(III)    State attorneys general in connection with any criminal investigation;

(IV)    any appropriate State regulatory authority; and

5

(V)   a self-regulatory organization, with respect to an audit report for a broker or dealer that is under the jurisdiction of such self-regulatory organization, each of which shall maintain such information as confidential and privileged.

(C)   Availability to foreign oversight authorities

Without the loss of its status as confidential and privileged in the hands of the Board, all information referred to in subparagraph (A) that relates to a public accounting firm that a foreign government has empowered a foreign auditor oversight authority to inspect or otherwise enforce laws with respect to, may, at the discretion of the Board, be made available to the foreign auditor oversight authority, if—

(i)   the Board finds that it is necessary to accomplish the purposes of this Act or to protect investors;

(ii)   the foreign auditor oversight authority provides—

(I)   such assurances of confidentiality as the Board may request;

(II) a description of the applicable information systems and controls of the foreign auditor oversight authority; and

(III) a description of the laws and regulations of the foreign government of the foreign auditor oversight authority that are relevant to information access; and

(iii)   the Board determines that it is appropriate to share such information.

6

**(5)    Immunity**

Any employee of the Board engaged in carrying out an investigation under this Act shall be immune from any civil liability arising out of such investigation in the same manner and to the same extent as an employee of the Federal Government in similar circumstances.

**(c)    Disciplinary procedures**

**(1)    Notification; recordkeeping**

The rules of the Board shall provide that in any proceeding by the Board to determine whether a registered public accounting firm, or an associated person thereof, should be disciplined, the Board shall—

(A)    bring specific charges with respect to the firm or associated person;

(B)    notify such firm or associated person of, and provide to the firm or associated person an opportunity to defend against, such charges; and

(C)    keep a record of the proceedings.

**(2)    Public hearings**

Hearings under this section shall not be public, unless otherwise ordered by the Board for good cause shown, with the consent of the parties to such hearing.

**(3)    Supporting statement**

A determination by the Board to impose a sanction under this subsection shall be supported by a statement setting forth—

(A)     each act or practice in which the registered public accounting firm, or associated person, has engaged (or omitted to engage), or that forms a basis for all or a part of such sanction;

(B)     the specific provision of this Act, the securities laws, the rules of the Board, or professional standards which the Board determines has been violated; and

(C)     the sanction imposed, including a justification for that sanction.

## (4)     Sanctions

If the Board finds, based on all of the facts and circumstances, that a registered public accounting firm or associated person thereof has engaged in any act or practice, or omitted to act, in violation of this Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under this Act, or professional standards, the Board may impose such disciplinary or remedial sanctions as it determines appropriate, subject to applicable limitations under paragraph (5), including—

(A)     temporary suspension or permanent revocation of registration under this subchapter;

(B)     temporary or permanent suspension or bar of a person from further association with any registered public accounting firm;

(C)     temporary or permanent limitation on the activities, functions, or operations of such firm or person (other than in connection with required additional professional education or training);

8

(D)   a civil money penalty for each such violation, in an amount equal to—

(i)   not more than $100,000 for a natural person or $2,000,000 for any other person; and

(ii)   in any case to which paragraph (5) applies, not more than $750,000 for a natural person or $15,000,000 for any other person;

(E)   censure;

(F)   required additional professional education or training; or

(G)   any other appropriate sanction provided for in the rules of the Board.

## (5)   Intentional or other knowing conduct

The sanctions and penalties described in subparagraphs (A) through (C) and (D)(ii) of paragraph (4) shall only apply to—

(A)   intentional or knowing conduct, including reckless conduct, that results in violation of the applicable statutory, regulatory, or professional standard; or

(B)   repeated instances of negligent conduct, each resulting in a violation of the applicable statutory, regulatory, or professional standard.

## (6)   Failure to supervise

(A)   In general

The Board may impose sanctions under this section on a registered accounting firm or upon any person who is, or at

the time of the alleged failure reasonably to supervise was, a supervisory person of such firm, if the Board finds that—

(i)     the firm has failed reasonably to supervise an associated person, either as required by the rules of the Board relating to auditing or quality control standards, or otherwise, with a view to preventing violations of this Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission under this Act, or professional standards; and

(ii)     such associated person commits a violation of this Act, or any of such rules, laws, or standards.

(B)     Rule of construction

No current or former supervisory person of a registered public accounting firm shall be deemed to have failed reasonably to supervise any associated person for purposes of subparagraph (A), if—

(i)     there have been established in and for that firm procedures, and a system for applying such procedures, that comply with applicable rules of the Board and that would reasonably be expected to prevent and detect any such violation by such associated person; and

(ii)     such person has reasonably discharged the duties and obligations incumbent upon that person by reason of such procedures and system, and had no reasonable cause to believe that such procedures and system were not being complied with.

10

**(7)   Effect of suspension**

(A)   Association with a public accounting firm

It shall be unlawful for any person that is suspended or barred from being associated with a registered public accounting firm under this subsection willfully to become or remain associated with any registered public accounting firm, or for any registered public accounting firm that knew, or, in the exercise of reasonable care should have known, of the suspension or bar, to permit such an association, without the consent of the Board or the Commission.

(B)   Association with an issuer, broker, or dealer

It shall be unlawful for any person that is suspended or barred from being associated with a registered public accounting firm under this subsection willfully to become or remain associated with any issuer, broker, or dealer in an accountancy or a financial management capacity, and for any issuer, broker, or dealer that knew, or in the exercise of reasonable care should have known, of such suspension or bar, to permit such an association, without the consent of the Board or the Commission.

**(d)   Reporting of sanctions**

(1)   Recipients

If the Board imposes a disciplinary sanction, in accordance with this section, the Board shall report the sanction to—

(A)   the Commission;

11

(B)   any appropriate State regulatory authority or any foreign accountancy licensing board with which such firm or person is licensed or certified; and

(C)   the public (once any stay on the imposition of such sanction has been lifted).

(2)   Contents

The information reported under paragraph (1) shall include—

(A)   the name of the sanctioned person;

(B)   a description of the sanction and the basis for its imposition; and

(C)   such other information as the Board deems appropriate.

**(e)   Stay of sanctions**

(1)   In general

Application to the Commission for review, or the institution by the Commission of review, of any disciplinary action of the Board shall operate as a stay of any such disciplinary action, unless and until the Commission orders (summarily or after notice and opportunity for hearing on the question of a stay, which hearing may consist solely of the submission of affidavits or presentation of oral arguments) that no such stay shall continue to operate.

(2)   Expedited procedures

The Commission shall establish for appropriate cases an expedited procedure for consideration and determination of

the question of the duration of a stay pending review of any disciplinary action of the Board under this subsection.